# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| WILLIAM JAMES RYAN, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) CAUSE NO. 1:12-CV-43 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff William Ryan appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Ryan applied for DIB and SSI in August 2008, alleging that he became disabled as of September 7, 2007. (Tr. 150-55.) For purposes of his DIB application, Ryan must show that he was disabled before his DIB-insured status expired on December 31, 2010. (Tr. 25); *see Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that he was disabled on or before his date last insured in order to recover DIB benefits).

---

[1] All parties have consented to the Magistrate Judge. (Docket # 15); *see* 28 U.S.C. § 636(c).

The Commissioner denied Ryan's application initially and upon reconsideration, and Ryan requested an administrative hearing. (Tr. 90-117, 125-48.) On March 30, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") Daniel Mages, at which Ryan (who was represented by counsel), his wife, and a vocational expert ("VE") testified. (Tr. 40-89.) On May 26, 2010, the ALJ rendered an unfavorable decision to Ryan, concluding that he was not disabled because he could perform a significant number of unskilled, light work jobs in the economy. (Tr. 25-35.) The Appeals Council denied Ryan's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 8); 20 C.F.R. §§ 404.981, 416.1481.

Ryan filed a complaint with this Court on February 13, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Ryan advances three arguments: that the ALJ (1) improperly discounted the credibility of his symptom testimony; (2) failed to develop the record by ordering intelligence testing; and (3) failed to properly evaluate the opinion of Dr. Bacchus, a consulting physician. (Mem. in Supp. of Pl.'s Mot. for Summ. Reversal 8-12.)

## II. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Ryan was fifty years old; had a high school education, with some special education; and possessed work experience as a general laborer, painter, and stocker. (Tr. 46-50, 150, 210, 246.) Ryan alleges that he became disabled due to scoliosis/back pain, memory loss, and "comprehension problems." (Tr. 209.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 383-page administrative record necessary to the decision.

2

At the hearing, Ryan testified that he lived with his wife, sister-in-law, and brother-in-law. (Tr. 45.) He is independent with his self care, drives a car, and is able to balance a checkbook and perform simple addition and subtraction. (Tr. 45, 47, 51.) His wife does the grocery shopping, but Ryan thought that he could do it if needed; he uses an electric cart when shopping. (Tr. 52.) On a typical day, he naps; watches television; helps with the laundry; occasionally cooks meals and washes dishes, sitting down every ten minutes; and takes walks of not more than 100 yards. (Tr. 51-53.) He does wood crafts as a hobby, which he explained is "pretty much a sit-down job." (Tr. 53.) Ryan stated that he went back to work after his alleged onset date of disability, but left after two months because he could not perform the prolonged standing or walking that the job required. (Tr. 48.)

As to his physical limitations, Ryan arrived at the hearing with a walker, reporting that he started using it periodically just a few days earlier due to his difficulty standing. (Tr. 45.) His doctor did not write a prescription for the walker, but told him that it would be "a good idea to have it in case [he] needed to stand for long." (Tr. 45.) Ryan further testified that his back pain is aggravated by bending and lifting and his leg intermittently "goes numb," causing him to use a cane "[a]ll the time" for the past two years and, more recently, the walker. (Tr. 55-56.) He thought that he could sit for no longer than fifteen minutes at a time and stand for about ten minutes. (Tr. 56-57.) He was taking a variety of pain medications, which cause him to "shake" and feel sleepy; he rated his pain on a ten-point scale as a "nine" without medication and a "five" when medicated. (Tr. 57-58.)

Ryan also stated that he suffered from a bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), and depression, for which he takes medication. (Tr. 60-62.) He reported

3

that without his medication, he has significant mood swings, but when medicated, they are less frequent and less intense; he did not complain of any side effects from the medication. (Tr. 62.) He also attended counseling occasionally, which he found helpful, even though he did not consistently follow through with it. (Tr. 63-64.) In addition, he complained of difficulty with memory, concentration, and understanding instructions.[3] (Tr. 65-66.)

## B. Summary of the Relevant Medical Evidence

On September 30, 2008, Ryan underwent a mental status examination by Candace Martin, Psy.D. (Tr. 246-53.) She noted that he had no history of mental healthcare, but planned to go to the Northeastern Center for an ADHD evaluation; he told her that he attended special education classes all through school and that comprehension was his biggest problem. (Tr. 246-47.) Dr. Martin wrote that Ryan showed no evidence of a thought disorder, but that his responses were reflective of lower intelligence. (Tr. 247.) His social skills, judgment, and insight were adequate, and his conversation was logical, relevant, and coherent. (Tr. 247-48.) His receptive language skills were mildly impaired, as he was able to attend to tasks but needed considerable repetition of instructions; his responses were concrete. (Tr. 247.) His mood was notably discouraged, pessimistic, and reflective of performance anxiety, and his affect was appropriate to his mood. (Tr. 247.) The results of the WIMS-III suggested that his ability to recall information, both immediate and after thirty minutes was in the low average range and that his ability to sustain attention and concentration during a task was in the borderline range. (Tr. 249.)

---

[3] Ryan's wife also testified at the hearing, for the most part corroborating his testimony. (Tr. 78-81.) She did state, however, that she helps him don his pants and shoes and that three or four times a week, he has a twenty-minute "outrage" of anger, which causes him to cry in frustration. (Tr. 78-81.)

Dr. Martin noted that although Ryan claimed he could not sit for more than five minutes and may have ADHD, he actually sat quite well during the examination without any restlessness. (Tr. 249.) She thought that the mental status examination indicated that he most likely was functioning in the borderline range of intelligence or lower and that his memory skills were in the low average to borderline range. (Tr. 249.) She opined that he would need to be in an employment environment that considered his physical limitations as well as his lower intellectual functioning and that he may have particular difficulty with tasks requiring strong skills of cognitive understanding, good memory, and good academic skills. (Tr. 250.) She thought he also may show some limitations in time constraints and that he appeared "poorly motivated and may tend to give up easily in the face of difficulty." (Tr. 250.) She diagnosed him with an adjustment disorder with depressed mood and probable borderline intellectual functioning, assigning him a Global Assessment of Functioning ("GAF") score of 51.[4] (Tr. 250.)

On October 17, 2008, Ryan underwent a physical exam by Dr. H.M. Bacchus. (Tr. 254-56.) He exhibited a limited range of motion in his lower back, right shoulder, knees, hips, and left ankle. (Tr. 255.) His gait and station were normal, and he did not use an assistive device; his gait speed, however, was slightly slower, but did appear sustainable. (Tr. 255.) He was able to walk on heels and toes and tandem walk. (Tr. 255.) Dr. Bacchus diagnosed Ryan with mild scoliosis with mid and lower back pain and mild degenerative disk disease of the lumbosacral spine, articulating that he "appear[ed] to retain the functional capacity to perform light to

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

moderate duties." (Tr. 255.)

That same month, Dr. R. Fife, a state agency physician, reviewed Ryan's record and completed a physical RFC assessment. (Tr. 257-64.) He concluded that Ryan could lift ten pounds frequently and twenty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 258-59.) Dr. Fife's opinion was later affirmed by Dr. D. Neal, a second state agency physician. (Tr. 289.)

In December 2008, J. Gange, Ph.D., a state agency psychologist, reviewed Ryan's record and completed a psychiatric review technique, concluding that Ryan had mild restrictions in activities of daily living and social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 265-78.) He also completed a mental RFC assessment, indicating that Ryan was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; respond appropriately to changes in the work setting; and set realistic goals. (Tr. 279-80.) Dr. Gange found that Ryan had no significant limitations in the remaining fifteen mental activity categories. (Tr. 279-80.) Dr. Gange's opinion was later affirmed by Joseph Pressner, Ph.D., a second state agency psychologist. (Tr. 290.)

On October 28, 2008, Ryan was seen at the Northeastern Center, complaining that he was quick to anger and having difficulty with his wife. (Tr. 286.) He stated that he wanted medication to take care of his anger and emotions but that he did not want to attend therapy. (Tr. 286.) He was assigned a GAF of 60 and diagnosed with depressive disorder NOS, rule-out bipolar disorder, and rule-out ADHD. (Tr. 286.) The following month, Ryan attended a family

6

therapy session with his wife; he reported being easily distracted and overly emotional. (Tr. 285.) He attributed his increased irritability to his physical pain and limitations. (Tr. 285.)

On January 28, 2009, Ryan visited the Faith Community Health Clinic, complaining of pain in his back, shoulders, and legs. (Tr. 303.) He returned in April to get his medications refilled. (Tr. 310.) In August and September, Ryan's knee was swollen and tender, and in October he complained of skin boils on his groin, chest pain and numbness when sitting, and shortness of breath when walking. (Tr. 307.) In February 2010, Ryan exhibited a limp and was using a cane; he asked about increasing his Tramadol dosage. (Tr. 379.)

On July 6, 2011, Ryan presented at the emergency room with shooting pain and numbness in his left leg. (Tr. 381-82.) An x-ray was normal, but a straight-leg raising test was positive on the left. (Tr. 381.) Ryan had mild tenderness in his lumbar spine, and he walked with a cane. (Tr. 381.) He was diagnosed with probable radiculopathy. (Tr. 381.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

**IV. ANALYSIS**

*A. The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On May 26, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 25-35.) He found at step one of the five-step analysis that Ryan had not engaged in substantial gainful activity since his alleged onset date and at step two that his scoliosis, borderline intellectual functioning, and bipolar disorder were severe impairments. (Tr. 28.) At step three, the ALJ determined that Ryan's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 29.)

Before proceeding to step four, the ALJ determined that Ryan's symptom testimony was not reliable to the extent it was inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform a range of light work defined as follows: sitting six hours during an eight-hour workday, and standing and walking six hours during an eight-hour workday, with the ability to sit or stand while remaining at the workstation; lifting, carrying, pushing and pulling twenty pounds occasionally and ten pounds frequently, but no overhead work; occasionally climbing ramps and stairs, balancing, stooping, kneeling,

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

crouching and crawling; no climbing ladders, ropes or scaffolds; no work around dangerous moving machinery or at unprotected heights; and the work must be simple and repetitive in nature with the ability to attend and concentrate for two hours at a time.

(Tr. 31.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that Ryan was unable to perform any of his past relevant work as a rough painter and paint line worker. (Tr. 34.) The ALJ then concluded at step five that Ryan could perform a significant number of jobs within the economy, including inspector/hand packager, folder of laundry products, and photocopy machine operator. (Tr. 34-35.) Accordingly, Ryan's claims for DIB and SSI were denied. (Tr. 35.)

### C. The ALJ's Credibility Determination Will Be Remanded

In general, an ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, Ryan contends that the ALJ's decision to assign "little weight" (Tr. 32) to his symptom testimony was based on "serious errors in reasoning." *Carradine*, 360 F.3d at 754.

10

Indeed, the ALJ's credibility determination does not withstand scrutiny, as *most* of the reasons proffered by the ALJ were significantly flawed.

To elaborate, when discounting Ryan's credibility, the ALJ reasoned:

> [Claimant's] use of a cane suggests he would have difficulty standing and walking for prolonged periods, and as his attorney argued he would be limited to sedentary work. However, I do not find his testimony presentation at the hearing to be credible. At his hearing the claimant was observed to be using a walker. When questioned about it, he reported he had just start[ed] using it a couple of days ago. His doctor did not prescribe it, but thought it would be a good idea to use if he needed to stand for long periods. The claimant further stated he had been using a cane all the time for about two years. When it was noted he did not have a cane when he underwent a consultative exam in September 2008, the claimant first responded that he did not yet have it and that he forgot it that day.
>
> The timing of the claimant getting a walker just a few days before his hearing, the lack of a prescription for either the cane or walker, and his inconsistent responses cast significant doubt upon his credibility. Adding to this is the fact that he was observed to sit comfortably at his consultative psychological evaluation after reporting he could not sit for more than five minutes. The claimant also reported engaging in a variety of daily activities at his evaluation which is inconsistent with someone who is so limited as to need a cane at all times. When he was first observed to use a cane at the Clinic, an examination showed him to be able to move all of his extremities equally. Lastly the physical examination by Dr. Bacchus and the diagnostic testimony show only mild scoliosis/degenerative disk disease.

(Tr. 32.)

First, although an ALJ may indeed discount a claimant's credibility as a result of inconsistent statements, *see, e.g., Kornfield v. Apfel*, No. 00C 5642, 2003 WL 103009, at *4 (N.D. Ill. Jan. 9, 2003), the ALJ's discrediting of Ryan based on his misstatement concerning the length of time he has used a cane mischaracterizes the record to some extent and, accordingly, is overly harsh. When the ALJ drew Ryan's attention to the fact that his lack of a cane at Dr. Bacchus's examination in September 2008 was inconsistent with his testimony that he had used

11

a cane "all the time" for the past two years, the transcript does *not* reflect that Ryan gave "two conflicting reasons why he did not have the cane at the exam" as the ALJ and the Commissioner's lawyers represent. (Tr. 32; Resp. Br. 5.) Rather, according to the transcript, Ryan responded that he "didn't think [he] even had [the cane] at that time," but when reminded of the date, acknowledged that it was "after [he] got it." (Tr. 56.) He then simply stated: "I've been forgetting a lot of stuff." (Tr. 56.) As Ryan asserts, the WIMS-III test results revealed that his memory skills fell within the low average to borderline range. In light of these memory challenges, the ALJ's discounting of Ryan's credibility based on his difficulty recalling events that took place seventeen months earlier is not particularly logical. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (emphasizing that an ALJ must "build an accurate and logical bridge between the evidence and the result" when making a credibility determination).

Second, and more significantly, the ALJ seemed to heavily rely on the fact that Ryan did not have a physician's prescription for his cane or walker. But the Seventh Circuit Court of Appeals has definitively articulated that "[a] cane does not require a prescription," characterizing an ALJ's discounting a claimant's complaints of pain on this basis as "absurd." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription; it had been suggested to the plaintiff by an occupational therapist."). Therefore, "the fact that an individual uses a cane not prescribed by a doctor is not probative of [his] need for the cane in the first place." *Eaken v. Astrue*, 432 F. App'x 607, 613 (7th Cir. 2012) (unpublished) (citing *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009)).

And as Ryan emphasizes, his credibility with respect to the use of a cane or walker is

quite pivotal to his application for disability—a point that the ALJ even acknowledged. As the ALJ explained, "[t]he use of a cane suggests [Ryan] would have difficulty standing and walking for prolonged periods . . . and would be limited to sedentary work." (Tr. 32.) Because Ryan was fifty years old at the time of the ALJ's decision, an RFC for sedentary work ostensibly would entitle him to a finding of disability under the Medical-Vocational Guidelines known as the "grids." 20 C.F.R. Part 404, Subpt. P, App. 2, Rule 202.12. Therefore, the ALJ's discounting of Ryan's credibility concerning the lack of a prescription for his cane or walker cannot be discarded simply as a harmless error. *See generally Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).

Third, the ALJ commented that when Ryan's use of a cane was first documented at a physician's appointment, "an examination showed him to be able to move all of his extremities equally." (Tr. 32 (citing 310).) But it is unclear how Ryan's ability to move his arms and legs equally upon examination discredits his need for a cane due to back pain and intermittent leg numbness. Rather, it appears that the ALJ succumbed to "play doctor" when he independently concluded that equal extremity movement is somehow inconsistent with chronic back pain and intermittent leg numbness. *See, e.g*, *Fansler v. Astrue*, No. 1:07-cv-81, 2008 WL 474205, at *7 (N.D. Ind. Feb. 19, 2008) (collecting cases and rejecting the ALJ's unsupported assertion that an individual's muscle strength must be diminished if he is suffering from chronic pain). Consequently, the ALJ's logic is again difficult to trace. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (explaining that the ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion" (citation omitted)).

13

Finally, as a fourth flaw, the ALJ reasoned that Ryan's report to Dr. Martin of "engaging in a variety of daily activities" was "inconsistent with someone who is so limited as to need a cane at all times." (Tr. 32.). Of course, "an ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *accord Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Unfortunately, here, "we are left to ponder what exactly are these inconsistencies because the ALJ provided no further explanation." *Zurawski*, 245 F.3d at 887 (stating that the ALJ should have explained the inconsistencies between the claimant's activities of daily living (which were punctured with rest), his pain complaints, and the medical evidence). "Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*. (internal quotation marks omitted).

In fact, the daily activities that Ryan reported to Dr. Martin were "fairly restricted . . . and not of a sort that necessarily undermines or contradicts a claim of disabling pain." *Id*. Ryan stated that he did some simple cooking, washed dishes, drove, did woodworking, vacuumed, and took daily walks. He testified at the hearing that when performing household chores or woodworking, he primarily does so from a seated position, standing only for ten minutes at a time (Tr. 52-53); he uses an electric cart when shopping (Tr. 52); and his daily walks involve "[s]omewhere not very far," "maybe 100 yards" (Tr. 51). Thus, on this record, the Court is hard-

14

pressed to understand how Ryan's minimal daily activities (with the exception, perhaps, of vacuuming) supports a conclusion that he was able to perform light work—which requires at least six hours of standing or walking in an eight-hour workday—on a full-time basis. *See Jelinek*, 662 F.3d at 812. "[M]inimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." *Clifford*, 227 F.3d at 872; *see also Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (unpublished) (opining that the claimant's minimal daily activities, which included two hours of house chores punctuated with rest, cooking simple meals, and grocery shopping three times per month, were not inconsistent with her claims of disabling pain); *Zurawksi*, 245 F.3d at 887 (same).

Admittedly, the ALJ mentioned a few other reasons to discredit Ryan that have more traction. He thought it suspicious that Ryan started using a walker just a few days before the hearing; noted that although Ryan told Dr. Martin that he could sit for no more than five minutes, Dr. Martin documented that he actually "was able to sit quite well during the evaluation without restlessness"; and observed that Dr. Bacchus's physical examination and the diagnostic testing "show[ed] only mild scoliosis/degenerative disc disease." (Tr. 32.) Nevertheless, these other reasons do not assuage the Court's concern that (1) *the majority* of the reasons that the ALJ relied on in discounting Ryan's credibility were flawed, and (2) the flaws appear directly relevant to whether Ryan has the ability to perform activities that require at least six hours of standing or walking in an eight-hour period, rather than activities that are primarily sedentary in nature—a point pivotal to his claim for disability.

Consequently, the case will be remanded so that the ALJ may reassess the credibility of

Ryan's complaints in accordance with Social Security Ruling 96-7p.[6] *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) ("In evaluating the credibility of statements supporting a Social Security application, we have noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p.").

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion. The Clerk is directed to enter a judgment in favor of Ryan and against the Commissioner.

SO ORDERED. Enter for this 1st day of March, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[6] Because a remand is warranted on the basis of the ALJ's flawed credibility determination, the Court need not reach Ryan's remaining two arguments concerning the ALJ's purported failure to develop the record and his consideration of Dr. Bacchus's opinion.